# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JANUARY SESSION, 1999

FILED

June 1, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9801-CR-00016** |
| | ) | |
| Appellee, | ) | |
| | ) | **DAVIDSON COUNTY** |
| **V.** | ) | |
| | ) | |
| | ) | **HON. CHERYL BLACKBURN,** |
| **BARRY WADDELL,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(RAPE OF A CHILD)** |


FOR THE APPELLANT:                    FOR THE APPELLEE:


**LIONEL R. BARRETT, JR.**             **JOHN KNOX WALKUP**
Washington Square Two, Suite 418       Attorney General & Reporter
222 Second Avenue North
Nashville, TN 37201                    **DARYL J. BRAND**
(On Appeal Only)                       Assistant Attorney General
                                       2nd Floor, Cordell Hull Building
                                       425 Fifth Avenue North
**DIANNE TURNER**                      Nashville, TN 37243
Trial Lawyers Building
430 Third Avenue North, Suite 101
Nashville, TN 37201-1111              **VICTOR S. JOHNSON, III**
(At Trial Only)                        District Attorney General


**DAVID A. COLLINS**                   **WILLIAM REED**
211 Printers Alley Building, Suite 400  Assistant District Attorney General
Nashville, TN 37201                    Washington Square, Suite 500
(At Trial Only)                        222 2nd Avenue North
                                       Nashville, TN 37201-1649


OPINION FILED _____

AFFIRMED IN PART; REVERSED AND MODIFIED IN PART

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Barry Waddell, appeals as of right from his conviction in the Davidson County Criminal Court. After a jury trial, Defendant was convicted of two (2) counts of rape of a child (Counts 1 and 2) and two (2) counts of aggravated sexual battery (Counts 3 and 4). Defendant was sentenced to twenty-five (25) years for each count of rape of a child and ten (10) years for each count of aggravated sexual battery, with all sentences to be served consecutively, for an effective sentence of seventy (70) years. Defendant argues that the trial court improperly sentenced him to the maximum period of incarceration for his rape of a child convictions and erred in ordering his sentences to be served consecutively. We affirm in part, and reverse and modify in part.

When an accused challenges the length, range or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment.

Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At trial, the victim, K.S. (it is the policy of this court not to refer to child victims of sexual offenses by name), testified that her best friend was Whitney Rickman, stepdaughter of the Defendant. The victim was ten (10) years old at the time of trial. When she was seven (7) years old in 1994, K.S. visited Whitney Rickman almost every weekend. Defendant took her into the upstairs bedroom to "play modeling" while he took photographs. The victim indicated receiving "bad touches" from the Defendant while "modeling" in an upstairs bedroom alone with the Defendant. K.S. recalled that normally Whitney Rickman would be outside the door with the door closed to the bedroom. K.S. indicated that her private parts were touched with the Defendant's mouth, his finger and his penis. This touching included digital penetration and cunnilingus. The victim stated that the Defendant instructed her not to tell anyone about these events. From K.S.'s testimony, this abuse occurred frequently for a period of 1.5 years.

Arthur William Rees, employed by the Youth Services Division of the Nashville Police Department, testified at trial that he received a complaint regarding an

allegation of child abuse of K.S. on April 3, 1995. Rees met with the victim's parents on April 4, 1995, and then interviewed K.S. the following day at McMurray Middle School. When he told the victim why he was there, the victim became "very distraught, withdrawn, and she seemed like she didn't want to talk. It affected her very -- it was a visible . . . she was visibly shaken when we told her why we were there to talk to her." K.S. became so upset and defensive that the interview had to be terminated until a later date.

Nancy Quiggle was the therapist for the victim at the Rape and Sexual Abuse Center. Quiggle testified at the sentencing hearing that K.S. had been a therapy patient since July 1995. The victim participates in therapy weekly in a very small group setting. When Quiggle first met K.S., Quiggle observed that she was:

> carrying a lot of guilt . . . felt very responsible for a lot of what had happened to her . . . felt a lot of shame to the point where when she initially disclosed, she left a lot of what had happened out of the disclosure, and it took quite a bit of time to develop a relationship with me and starting to build some trust and starting to understand that what had happened was not her fault before she was able to really come out with all the things that had occurred.

Quiggle stated that K.S. was "afraid that if she told, she would be punished or hurt; that there was, you know, the threat made to her that if you tell, you know, I will hurt you, and so she was afraid that if she did tell, he would carry forth on his threat and she would be hurt."

Quiggle described that initially the victim did not want to talk about the sexual abuse, but that she only would write down four (4) things that had occurred on a piece of paper. She erased these four (4) things, but eventually was able to rewrite them and keep it written on the paper. Initially, K.S. described having frequent nightmares, full of scary things and people. Quiggle could not recall if these

nightmares were specific to the abuse. After several months, K.S. told Quiggle that she thought she could use some dolls to depict what had happened to her. Even when the victim used objects to describe the sexual abuse, she would ask Quiggle to look away. While K.S. did not want to describe to her parents the various incidents of sexual abuse, she allowed Quiggle to tell them when she was not present.

Quiggle noted that these sexual crimes committed upon K.S. have affected her ability to trust other individuals. While Quiggle could not state exactly how long the victim would need to continue therapy (estimating six (6) months), she noted that the reason that the therapy had continued this long was because "of the continued stress of what wound up happening. I think once she feels secure that she is safe, that her abuser is in prison and she is not going to have to deal with him anymore, she may phase off therapy." In terms of the victim's emotional status, Quiggle stated that "it is still to this day very difficult for her to talk about it, and even if she hears about sexual abuse. She told me once that in a class, they had somebody come in to do a prevention program, and that it was so upsetting to her that she cried and left the room, so I think the subject still triggers in her a lot of emotion, negative emotion and sadness and fear."

On cross-examination, Quiggle stated that throughout her therapy, K.S. had maintained good grades, had not exhibited any signs of antisocial behavior, nor had she withdrawn from her friends or family. However, Quiggle stated that while an outsider could not immediately notice any adverse effects upon the victim, the distress K.S. suffered "is very internal . . . because [K.S.] tends to be able to keep whatever pain she is feeling inside pretty well, and it comes up when it is triggered.

. . but I am seeing things that make me realize that there are still some internal stuff that is going on with [her] that I'm concerned about."

Dale Shade, the victim's father, testified that K.S. was ten (10) years old at the time of the sentencing hearing. Shade stated that K.S. had nightmares periodically since the abuse occurred. Before the original trial date was postponed from October 1996, Shade described that the victim was obviously nervous until a week or so before the trial date when she "was almost at a relieved standpoint because she felt that it was going to finally be over or her part in it." After learning that the trial was to be delayed until March 1997, K.S. became very upset because she had wanted to "get it over with." As the March trial date approached, the entire family became extremely anxious.

When asked to describe how these events had affected their daughter, Dale Shade read the following prepared response:

> How has what happened to [K.S.] affected us? Where do we start? For the past two years, we have been looking over our shoulders. We don't let [her] out of our sight, even when she is in our own backyard. There are only a few people we allow [her] to spend time with or even spend the night with. We've become very protective, sometimes a little too much, but hopefully that will lessen with time. [K.S.] has spent the last year and a half going to counseling every week. We don't know how long this will, she will have to continue, or periodically will she have to see someone for the rest of her life. And what will happen to her as she gets older and starts having relationships with boys? We are wondering, will these events be brought all back up?

> During this time, [she] has had nightmares, a lot of the times, she wants to sleep with her mother to help her get through this. She says she feels safer that way. We try to reassure her so that she won't be afraid. He took her innocence away. She is a little girl who has been put into an adult situation. This is a part of our life that we have unfortunately kept from our parents because we don't know how [her] grandparents will take this information and if they will treat her differently. We don't want that to happen, and we don't know how they will respond to these events.

It has changed all of her views. You think it will never happen to you. You think that you can protect your child from the big bad wolf, but then when the big bad wolf happens to be a friend's father, how can you continue to trust and teach [K.S.] how to trust people? We want [her] to have a fun childhood, but this happened, and it has taken away part of her childhood, a part that can never be regained. We don't want this to happen to anyone else, and the fact that he has used his own daughter for his sick satisfaction, we feel that someone like this should not be allowed back into our society until he has served the maximum amount of time for his crimes, and in my opinion, that is not even enough, a severe enough time.

Following Dale Shade's testimony, the trial court questioned him regarding the nature of relationship they had with the Defendant prior to their awareness of this situation. Shade stated that the Defendant was living with his girlfriend Carol and her daughter Whitney at that time, and they would drop off the victim at the Defendant's home nearly every week. They had all gone out to dinner several times together, with the Shade family having the Defendant and his family over to their home on numerous occasions. Shade noted that he had just built a pool, and the Defendant had come over and swam in their pool with the girls. Shade described their relationship with the Defendant as one in which they trusted Defendant with not only their property, but trusted him completely with the care of their daughter. Because Shade often worked on Sundays and was off on Saturdays, the Defendant would normally babysit the girls on Sunday and Shade would watch them on Saturday. After K.S.'s parents learned of the allegations of sexual abuse, this babysitting relationship with the Defendant was terminated.

Shade then read a letter addressed to the trial court, written by the victim, which stated:

Dear Judge: I hope that you all decide that Barry stays in jail a very long time [jail underlined many times]. Because of what he did, it is like he put a dent into my life. It's like when I was born, I started with a straight line, but now of what he did, now my line has a dent in it, plus I don't think it was right for him to touch me in the places he did. Well, I just

hope he stays in jail [underlined several times] until he is dead [several exclamation points].

I hope he stays in jail . . . I mean it. . . Love, [K.S.].

The Defendant testified on his own behalf, stating that he was falsely accused and convicted of a crime which he did not commit. Defendant explained that he was accused of this crime only because he tried to end his relationship with Carol Rickman. Defendant is a member of the Haywood Hills Baptist Church and has asked for forgiveness for his adulterous life. Defendant stated that he had been around lots of little girls and never had any desire to do anything to them. Other evidence presented on the Defendant's behalf included Honorable Discharge papers from the Air Force.

Following the presentation of proof at the sentencing hearing, the trial court stated that it would consider the evidence at trial and the sentencing hearing, the principles outlined by the General Assembly for sentencing, any arguments of counsel, the nature and the characteristics of the crime, any enhancing and mitigating factors and the statement of the Defendant. In looking at the enhancement factors, the trial court considered Counts One (1) and Two (2) (rape of a child) jointly and Counts Three (3) and Four (4) (aggravated sexual battery) jointly.

.

The trial court found as applicable enhancement factor (1), that defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). Defendant admitted to using marijuana on previous occasions in the past. In

addition, the trial court noted that it could consider any evidence of sexual crimes not charged in this case, based upon the number of times and the length that this abuse went on. State v. Hunter, 926 S.W.2d 744, 748-49 (Tenn. Crim. App. 1995). Enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, was also applied by the trial court. Tenn. Code Ann. § 40-35-114(6). Evidence that K.S. required counseling as a result of this incident, had nightmares, and continued to be emotionally traumatized by this sexual abuse were all supportive of this factor. See State v. McKnight, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994).

Because this was a modeling game wherein the Defendant took a camera and took pictures of a partially nude child, the trial court found the evidence clearly supported factor (7) as the offense was committed to gratify the Defendant's desire for pleasure or excitement as to the convictions for rape of a child. Tenn. Code Ann. § 40-35-114(7). The trial court correctly found that this factor only applied to the convictions for rape of a child. Intent to gratify a desire for pleasure and excitement is a necessary element of aggravated sexual battery and that factor cannot be used to enhance the sentences for the convictions of this offense. See State v. Kissinger, 922 S.W.2d 482, 498-90 (Tenn. 1996); State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995). Finally, the trial court applied factor (15) as the Defendant abused a position of trust, public or private, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of this offense. Tenn. Code Ann. § 40-35-114(15). The trial court based application of this factor upon Defendant's status as a friend of the family, entrusted to babysit their child, and the fact that the abuse had gone on for some period of time.

As far as mitigating factors, the only applicable mitigating factor was (13), that Defendant had been honorably discharged from the Air Force. Tenn. Code Ann. § 40-35-113(13). While Defendant relied upon his stable work history and lack of prior criminal record, the trial court refused to consider these. Thus, the trial court found enhancement factors (1), (6), and (15) and mitigating factor (13) applicable to all convictions. In addition, it found enhancement factor (7) also applicable to the convictions for rape of a child. In a sentencing order filed approximately six (6) days after the sentencing hearing, the trial court stated that it "gave great weight to enhancing factors 6 and 15 in calculating the defendant's sentence."

The sentence for a Range I, Class A felony is fifteen (15) to twenty-five (25) years. Tenn. Code Ann. § 40-35-112(a)(1). As to Counts One (1) and Two (2), the trial court found the maximum sentences were warranted and justifiable under the facts in this record and the application of enhancement factors (1), (6), (7) and (15). For Counts Three (3) and Four (4), the sentence for a Range I, Class B felony is not less than eight (8) nor more than twelve (12) years. Tenn. Code Ann. § 40-35-112(a)(2). In consideration of enhancement factors (1), (6) and (15), the trial court reasoned that a ten (10) year sentence, the mid-point of the range, was appropriate on each of those counts.

The trial court stated that it considered the presumptive sentence for Counts 1 and 2 to be a twenty (20) year sentence, the mid-range of that sentence. Tenn. Code Ann. § 40-35-210(c) (1995). This was error. The presumptive sentence for Class A felonies committed prior to July 1, 1995 is the minimum sentence. Because the Defendant committed the offenses before the July 1, 1995 amendment of Tennessee Code Annotated section 40-35-210, the minimum sentence in the

applicable range is the presumptive sentence. See Tenn. Code Ann. § 40-35-210(c)(1990) (Repealed July 1, 1995); State v. Ivory Thomas, No. 02C01-9705-CR-00179, Shelby County (Tenn. Crim. App., at Jackson, April 24, 1998) (No Rule 11 application filed). The record reflects that the authorities were notified of these offenses in April 1995, after which the evidence is conclusive that no further abuse occurred. Since the trial court applied an incorrect presumptive sentence on Counts 1 and 2, there is not a presumption of correctness for the sentences for rape of a child, and our review is de novo for these sentences.

Defendant argues that his previous criminal behavior, enhancement factor (1), was applied by the trial court in error as it is unclear as to what other sexual crimes are being referred to and Defendant's use of marijuana occurred over twenty (20) years prior to the trial. While the trial court did refer to Defendant's admission in the presentence report of using marijuana in the past, the trial court heavily relied upon the number of times and the length that the sexual abuse occurred. In State v. Hunter, 926 S.W.2d at 748-49, this court held that a defendant's prior criminal behavior may include evidence of sexual crimes committed but not prosecuted. We agree with the trial court's assessment that the Defendant's criminal behavior of sexually abusing the victim was an appropriate application of enhancement factor (1).

Secondly, the Defendant asserts that "in the absence of any personal injuries" it is improper to use enhancement factor [6] in this manner. The trial court relied upon the testimony that K.S. was scared, had nightmares and continued to require counseling as a result of the Defendant's abuse in applying factor (6). In State v. McKnight, 900 S.W.2d at 54, this court held that the fact that two (2) of the victims

of sexual abuse required counseling was sufficient to support the application of this enhancement factor. Clearly, the testimony demonstrated that K.S. had many problems during therapy and would need to continue therapy for an indefinite period into the future. We agree that this psychological trauma in the case sub judice necessitates the application of factor (6).

Finally, the Defendant argues that the application of enhancement factor [15] was erroneous as it carries the private trust position to an unacceptable degree. Defendant fails to cite any authority to support his argument; therefore, this issue is waived. Tenn. Ct. Crim. App. R. 10(b); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1988). Notwithstanding Defendant's failure to cite authority, the law is clear in Tennessee that a defendant occupying a relationship with a victim entrusted to his care which promotes "confidence, reliability or faith" in that defendant is sufficient for application of enhancement factor (15). See Kissinger, 922 S.W.2d at 488-89. There is no error in the length of Defendant's sentences for Counts 3 and 4, aggravated sexual battery.

Regarding Defendant's argument that the trial court erred in failing to consider any mitigating factors, we can find no error. While the presence of a criminal record is an enhancement factor, the absence of such is not a mitigating factor. State v. Robinson, 971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (citing State v. Keel, 882 S.W.2d 410, 422-23 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1994)). Particularly in view of Defendant's extensive criminal activity in this case, Defendant's lack of prior criminal convictions was appropriately ignored. While

Defendant's work record and contribution to his family may be entitled to some consideration, we find that it carries little weight in this case.

Reviewing the sentences for rape of a child de novo without the presumption of correctness, we note the following. Applying enhancement factors (1), (6), and (15), and mitigating factor (13) in this case, the trial court sentenced Defendant to ten (10) years on each conviction for aggravated sexual battery, the exact mid-point of the range. In its sentencing order, the trial court stated that it gave great weight to factors (6) and (15) in calculating Defendant's sentences for all four convictions, including rape of a child.

The trial court applied one (1) additional enhancement factor to the sentences for rape of a child, that being enhancement factor (7). The trial court did provide in its sentencing order the theoretical statement that "even if the court had calculated the sentence [for rape of a child] beginning at fifteen (15) years" the court would have imposed the maximum sentence of twenty-five (25) years. However, the court based this upon the "strength of the enhancing factors." The trial court enhanced the aggravated sexual battery sentences to the mid-point of the range based upon the strength of enhancement factors (1), (6), and (15). Of particular importance and significance in our de novo review is that the trial court did not give "great weight" to enhancing factor (7), the only additional factor applied to the sentences for rape of a child. Based upon our review of the entire record, including the findings of fact and weight afforded to the enhancing and mitigating factors by the trial court, we hold that the sentence for each conviction for rape of a child should be enhanced eight (8) years for a total sentence of twenty-three (23) years for each conviction for rape of a child, and the judgments for each such conviction are modified accordingly.

For Defendant's second issue, the imposition of consecutive sentences, he asserts that there was no clear indication that K.S. would suffer great mental damage for the rest of her life, and that the trial court failed to consider Defendant's lengthy work record, church activity, lack of criminal record and other evidence supporting his potential for rehabilitation. The trial court determined that the sentences were to be served consecutively based upon Defendant's convictions for two (2) or more statutory offenses involving the sexual abuse of a minor. Tenn. Code Ann. § 40-35-115(b)(5). The trial court alluded to the devastation of both families as justification for the sentences being consecutive. In addition, the trial court also found that the extensive damage to the victim and her family as a result of the Defendant's behavior and the statements of the Defendant justified that the consecutive sentencing was reasonably related to the severity of the offenses and was necessary in order to protect the public from further serious criminal conduct by the Defendant. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). In summation, the trial court stated that is was beyond the court's belief that Defendant would suggest that these charges were brought in revenge. The trial court felt Defendant's testimony was simply not credible.

If a defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim, the court may impose consecutive sentences. Tenn. Code Ann. § 40-35-115(b)(5). Due to the Defendant's status as a friend of the family, trusted to care for K.S. in their absence, the extensive time span of the abuse, the nature of the sexual abuse, including both

cunnilingus and digital penetration, as well as the extensive residual mental distress and damage the victim suffered, we can find no error in the trial court's imposition of consecutive sentences. Furthermore, the consecutive nature of the sentences was correctly justified as it was reasonably related to the severity of the crimes Defendant committed against K.S. and is necessary to protect the general public from further acts of sexual abuse of minors. This issue is without merit.

## CONCLUSION

The trial court used the incorrect presumptive sentence for the determination of Defendant's sentences for Counts 1 and 2. The sentences for each conviction for rape of a child are modified to twenty-three (23) years. The trial court committed no error in imposing consecutive sentences and in the length of sentences imposed for Counts 3 and 4. Accordingly, the judgments in Counts 3 and 4 are affirmed. The effective sentence for all counts is sixty-six (66) years.

_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
JOHN H. PEAY, Judge


_____
JERRY L. SMITH, Judge